James Bass, Jr., M.D., Plaintiff-Appellant,

v.

Mark Ambrosius and St. Luke's Medical Center, Inc.,
Defendants-Respondents.†

Court of Appeals

*Nos. 93–1840, 93–2528. Oral argument June 1, 1994.—Decided June 14, 1994.*

(Also reported in 520 N.W.2d 625.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Paul J. Gossens* and *Virginia E. George* of *Gossens & George, S.C.*, of Milwaukee. There was oral argument by *Paul J. Gossens*.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Michael P. Crooks* of *Peterson, Johnson & Murray, S.C.*, of Milwaukee. There was oral argument by *Mary K. Wolverton* of *Peterson, Johnson & Murray, S.C.*

Before Sullivan, Fine and Schudson, JJ.

FINE, J. James Bass, Jr., M.D., appeals from orders dismissing, on summary judgment, his complaint against St. Luke's Medical Center, Inc., and Mark Ambrosius, St. Luke's president. Although his complaint is prolix and far beyond the "short and plain statement" required by RULE 802.02(1)(a), STATS., Dr. Bass essentially claims that in April of 1989 his staff privileges at the hospital were illegally terminated. His appeal is limited to two of the spray of legal theories asserted before the trial court: breach of contract and an alleged violation of 42 U.S.C. § 1981.[1] Dr. Bass also claims entitlement to attorney's fees under 42 U.S.C. § 1988, and punitive damages. We reverse.

Boiled down to its essence, Dr. Bass' 114-paragraph complaint alleges that St. Luke's termination of his staff privileges violated its own bylaws and 42 U.S.C. § 1981, which, as pertinent here, secures to "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."[2] Dr. Bass is black.

---

[1] He does not appeal the trial court's dismissal of his tortious-interference-with-contractual-relations claim, or the trial court's dismissal of his claim asserting a violation of § 50.36(3)(a), STATS.

[2] 42 U.S.C. § 1981, as amended by section 101 of the Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071, provides:

**Equal rights under the law**

**(a) Statement of equal rights**
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

Summary judgment is used to determine whether there are any disputed issues for trial. *U.S. Oil Co. v. Midwest Auto Care Services, Inc.*, 150 Wis. 2d 80, 86, 440 N.W.2d 825, 827 (Ct. App. 1989). Our review of a trial court's grant of summary judgment is *de novo. See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). [3] We must first determine

---

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b)  Definition**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c)  Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Subsections (b) and (c) were added by the 1991 amendment, effective November 21, 1991, and the pre-amendment text was designated as subsection (a). The amendment was designed to overturn *Patterson v. McLean Credit Union*, 491 U.S. 164, 176-177 (1989), which held that 42 U.S.C. § 1981 did not encompass post contract-formation racial discrimination. *Rivers v. Roadway Express, Inc.*, 114 S. Ct. 1510, 1515 (1994). The 1991 amendments are not retroactive, *id.*, 114 S. Ct. at 1513, 1516, and thus do not apply to St. Luke's termination of Dr. Bass' staff privileges.

[3] Unfortunately, the trial court's oral decision was apparently not recorded; it certainly is not in the record. Although our review is *de novo*, the rationale underlying a trial court's decision on summary judgment is often extremely helpful to our analysis. Trial courts should fully express the reasons for their rulings, especially on summary judgment. Indeed, in complex

whether the complaint states a claim, *ibid.*, and, if so, whether "there is no genuine issue as to any material fact" so that a "party is entitled to judgment as a matter of law," *see* RULE 802.08(2), STATS.; *Green Spring Farms*, 136 Wis. 2d at 315, 401 N.W.2d at 820.

A. *Alleged violation of St. Luke's bylaws.*

St. Luke's contends that its bylaws do not constitute a contract between itself and Dr. Bass, and, therefore, any violation of those bylaws does not support a breach-of-contract claim. We disagree.

Whether hospital bylaws can constitute a contract between it and one of its staff physicians is a matter of first impression in Wisconsin.[4] The general rule elsewhere is that they can. *Lewisburg Community Hospital, Inc. v. Alfredson*, 805 S.W.2d 756, 759 (Tenn. 1991) (citing cases); *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73, 82-83 (N.D. 1991) (bylaws not violated); *Gianetti v. Norwalk Hospital*, 557 A.2d 1249, 1255 (Conn. 1989) (physician's agreement to comply with bylaws and hospital's independent duty to comply with bylaws, made bylaws " 'enforceable *part*' " of contract between hospital and physician, even though those bylaws did not "per se, create a contractual relationship" between hospital and physician) (citation omitted; emphasis by *Gianetti*); *Balkissoon v. Capitol Hill Hospital*, 558 A.2d 304, 307-308 (D.C. App. 1989) (citing cases) (hospital's obligation to comply

matters, a written decision by the trial court would not only be helpful to a reviewing appellate court, but also would be helpful to the trial court in reaching a well-reasoned result.

[4] *But see Hale v. Stoughton Hospital Ass'n, Inc.*, 126 Wis. 2d 267, 272-273 & n.1, 376 N.W.2d 89, 92 & n.1 (Ct. App. 1985) (hospital's obligation to comply with bylaws assumed but not decided).

with bylaws are also independent of any right founded in contract); *Pepple v. Parkview Memorial Hospital, Inc.*, 536 N.E.2d 274, 276 (Ind. 1989) (bylaws not violated); *Bouquett v. St. Elizabeth Corp.*, 538 N.E.2d 113, 115 (Ohio 1989) (citing cases); *Eidelson v. Archer*, 645 P.2d 171, 178 (Alaska 1982) (bylaws "form an integral part of the contractual relationship" between hospital and physician); *Anne Arundel Gen. Hospital, Inc. v. O'Brien*, 432 A.2d 483, 488 (Md. App. 1981) (calling rule "well settled"); *St. John's Hospital Medical Staff v. St. John Regional Medical Ctr., Inc.*, 245 N.W.2d 472, 474-475 (S.D. 1976); *Berberian v. Lancaster Osteopathic Hospital Ass'n, Inc.*, 149 A.2d 456, 458-459 (Pa. 1959); *but see Ponca City Hospital, Inc. v. Murphree*, 545 P.2d 738, 742 (Okla. 1976) (not reaching issue); *cf. Clough v. Adventist Health Systems, Inc.*, 780 P.2d 627, 632-633 (N.M. 1989) (compliance with bylaws); *Campbell v. St. Mary's Hospital*, 252 N.W.2d 581, 586-587 (Minn. 1977) (compliance with bylaws). To hold that a hospital did not have to comply with its bylaws would, of course, render them essentially meaningless. *Lewisburg Community Hospital*, 805 S.W.2d at 759; *Bouquett*, 538 N.E.2d at 115. They would then be a catalogue of rules, which, although binding on the medical staff, were merely hortatory as to St. Luke's—much "sound and fury, signifying nothing."[5]

The general rule that hospital bylaws can constitute a contract between the hospital and its staff is consistent with the law in this state that an employee handbook written and disseminated by the employer, and whose terms have been accepted by the employee, constitutes a contract between the employer and the employee. *See Ferraro v. Koelsch*, 124 Wis. 2d 154, 157-

---

[5] *Macbeth*, act V, scene v, lines 27-28.

158, 169, 368 N.W.2d 666, 668, 674 (1985). In *Ferraro*, the handbook was management's statement of what the company offered its employees, and what it expected from its employees in return. 124 Wis. 2d at 160, 165, 368 N.W.2d at 670, 672. It thus contained the essential elements of a binding contract: "the promise of employment on stated terms and conditions by [the employer] and the promise by [the employee] to continue employment under those conditions." *Id.*, 124 Wis. 2d at 164, 368 N.W.2d at 671-672. As the court noted, "[i]t is black letter law that a promise for a promise, or the exchange of promises, will constitute consideration to support any contract of this bilateral nature." *Id.*, 124 Wis. 2d at 164, 368 N.W.2d at 672.

The bylaws at issue here, required by WIS. ADM. CODE § HSS 124.12(5), and approved by St. Luke's board of directors, have the same contractual elements as did the handbook in *Ferraro*.[6] First, the bylaws state that they provide the rules that govern the "physicians

---

[6] WIS. ADM. CODE § HSS 124.12(5) provides, as material here:

BY-LAWS. (a) *Adoption and purpose.* By-laws shall be adopted by the medical staff and approved by the governing body to govern and enable the medical staff to carry out its responsibilities. The by-laws of the medical staff shall be a precise and clear statement of the policies under which the medical staff regulates itself.

(b) *Content.* Medical staff by-laws and rules shall include:

1. A descriptive outline of medical staff organization;

2. A statement of the necessary qualifications which each member must possess to be privileged to work in the hospital, and of the duties and privileges of each category of medical staff;

3. A procedure for granting and withdrawing privileges to each member;

4. A mechanism for appeal of decisions regarding medical staff membership and privileges.

. . . .

and dentists practicing at St. Luke's Hospital."[7] Second, members of the hospital's medical-dental staff must "continuously meet the qualifications, standards, and requirements set forth in these Bylaws." Third, an appointment to the medical-dental staff confers "only those privileges provided by the letter of appointment and these Bylaws." Fourth, an applicant for appointment to the medical-dental staff must submit a signed application acknowledging that, *inter alia*, he or she "shall be required to familiarize himself/herself with . . . [the] Bylaws." Finally, and most significant in light of *Ferraro*, an applicant for appointment to the medical-dental staff must submit a signed application attesting that he or she "has read and agreed to accept and abide by the provisions and directives" in the bylaws. Thus, Dr. Bass' application to the medical-dental staff acknowledged over his signature that he would "conduct [his] professional activities according to the bylaws and rules and regulations of both St. Luke's Hospital and the Medical-Dental Staff of St. Luke's Hospital which I have read and understood." (Uppercasing omitted.) In a separate letter, also part of the application process, Dr. Bass agreed to "conduct [his] activities according to the bylaws of St. Luke's Hospital, and the bylaws and rules and regulations of the St. Luke's Hospital Medical/Dental Staff which I have read and understood." For its part, St. Luke's promised

[7] The physicians and dentists practicing at St. Luke's Hospital, realizing that the best interests of the patient are achieved by concerted effort between the Medical-Dental Staff and the hospital authorities, *hereby organize themselves in accordance with these Bylaws* and Rules and Regulations as approved by the Board of Directors of St. Luke's Hospital, Inc., by and in accordance with its authority granted as a non-profit corporation organized under the laws of the State of Wisconsin.

(Emphasis added.)

that the medical-dental staff at the hospital "shall be guided and governed by rules and regulations consistent with these Bylaws," and promised that any adverse action against a member of the medical-dental staff would comply with various procedural safeguards.[8]

Just as there may be circumstances where an employee handbook is not a contract between the employer and the employee, *see Ferraro*, 124 Wis. 2d at 169, 368 N.W.2d at 674, there may be circumstances where hospital bylaws do not constitute a contract between the hospital and its staff. Dr. Bass' complaint, however, sufficiently alleges that the bylaws constituted a contract between him and St. Luke's. Additionally, St. Luke's has not submitted any evidentiary material that raises a genuine issue of fact in this regard. Accordingly, Dr. Bass was entitled to an order holding that St. Luke's had to comply with its bylaws before it could terminate his staff privileges. *See State v. Better Brite Plating, Inc.*, 160 Wis. 2d 809, 813-814, 466 N.W.2d 239, 243 (Ct. App. 1991) (pretrial order under RULE 802.11(1)(a), STATS., appropriate where legal or factual matters are capable of resolution prior to trial), *modified on other grounds*, 168 Wis. 2d 363, 483 N.W.2d 574 (1992). Dr. Bass has alleged and has submitted evidentiary material that raises genuine issues of fact as to whether St. Luke's breached those bylaws.[9]

---

[8] As noted earlier, WIS. ADM. CODE § HSS 124.12(5)(b)3 requires that the bylaws establish "[a] procedure for granting and withdrawing privileges to each member" of the medical staff. It does not, however, specify any particular procedure.

[9] Referring us to a 512-page exhibit filed with the trial court by Dr. Bass, St. Luke's argues, in a two-sentence paragraph in

B.  *Alleged violation of 42 U.S.C. § 1981.*

*Patterson v. McLean Credit Union*, 491 U.S. 164, 176-177 (1989), held that the "make . . . contracts" clause in 42 U.S.C. § 1981 "cannot be construed as a general proscription of racial discrimination in all aspects of contract relations," and thus does not extend to "conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." As noted in footnote 2, above, Congress overturned *Patterson* by amending § 1981, effective November 21, 1991. The amendments are not, however, retroactive, *Rivers v. Roadway Express, Inc.*, 114 S. Ct. 1510 (1994), and thus do not affect this case.

Dr. Bass concedes that § 1981, as interpreted by *Patterson*, does not proscribe the racially-motivated discharge of an employee. *See McKnight v. General Motors Corp.*, 908 F.2d 104, 108-109 (7th Cir. 1990), *cert. denied*, 499 U.S. 919. Nevertheless, he argues that his rights under § 1981 were violated because the termination of his staff privileges interfered with his ability to contract with prospective patients. The law in this area, however, is almost non-existent; Dr. Bass refers us to one case in support of his position—a trial-court decision denying a motion to dismiss, *Vakharia v. Swedish Covenant Hospital*, 765 F. Supp. 461 (N.D. Ill. 1991). *See also Imagineering, Inc. v. Kiewit Pacific*

the portion of its appellate brief headed "FACTS," that "any claim that the bylaws were breached with regard to Dr. Bass is completely unfounded." Although, as noted, our review here is *de novo*, we will not consider contentions that are not adequately briefed, *see W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634, 460 N.W.2d 787, 792 (Ct. App. 1990).

*Co.*, 976 F.2d 1303, 1313 (9th Cir. 1992) (allegations that a defendant's "acts were committed in order to intentionally deprive [plaintiff] of an opportunity" to contract with others "normally may be adequate to state a claim" under 42 U.S.C. § 1981), *cert. denied*, 113 S. Ct. 1664.

*Vakharia* held that an anesthesiologist's complaint that her allegedly discriminatory discharge from the hospital staff interfered with her ability to contract with prospective patients stated a claim under § 1981. 765 F. Supp. at 471-472. St. Luke's argues that, unlike the situation in *Vakharia*, where the anesthesiologist alleged that she was able to get patients only through assignment from the hospital and referral from other staff physicians, 765 F. Supp. at 472, Dr. Bass is on the staff of other hospitals and thus has ready access to a sufficiently large patient pool to ameliorate the impact of his discharge from St. Luke's. Perhaps, but this is summary judgment, and, at most, St. Luke's raises issues of fact that must be determined at trial. Moreover, a decision as to whether *Vakharia*'s analysis is sound, and, if so, the proper scope of its holding under the scenario presented by this case, should await until the facts are more fully developed at trial. *See Bowen v. Lumbermens Mut. Casualty Co.*, 183 Wis. 2d 627, 654, 655, 517 N.W.2d 432, 443 (1994) (although public-policy issues may be determined on summary judgment, "when the issues are complex or the factual connections attenuated, it may be desirable for a full trial to precede the court's determination"); *Maynard v. Port Publications, Inc.*, 98 Wis. 2d 555, 569, 297 N.W.2d 500, 507 (1980) ("The existence of a new or difficult issue of law does not, in and of itself, render the summary judgment mechanism inappropriate" if "a trial

would make deciding the question of law no easier."); 10A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2732 at 311 (summary judgment may be inappropriate if facts need to be developed "in order to clarify the application of new legal principles").

C. *Conclusion.*

Based on the foregoing, this case is remanded for a trial on Dr. Bass' breach-of-contract claim and his claim under 42 U.S.C. 1981 alleging that St. Luke's interfered with his ability to contract with prospective patients.

*By the Court.*—Orders reversed and cause remanded.