METHODIST MANOR HEALTH CENTER, INC., d/b/a
Maplewood Center, Plaintiff-Appellant,

v.

Ruth Ann Py and Nadine Ray,
Defendants-Respondents.

Court of Appeals

*No. 2007AP736. Submitted on briefs November 30, 2007.
—Decided January 15, 2008.*

2008 WI App 31

(Also reported in 746 N.W.2d 824.)

501

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Reginald Hislop, Jr.*, and *Donal M. Demet* of *Demet & Demet SC*, of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Anthony J. Staskunas* of *Elliott, Elliott & Staskunas* of Milwaukee.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. CURLEY, P.J. Methodist Manor Health Center, Inc., d/b/a Maplewood Center (Methodist Manor), appeals from a judgment dismissing its action against Ruth Ann Py and Nadine Ray following summary judgment proceedings. Methodist Manor contends that the trial court erred when it: (1) failed to properly interpret and apply *Methodist Manor of Waukesha, Inc. v. Martin*, 2002 WI App 130, 255 Wis. 2d 707, 647 N.W.2d 409; (2) rendered a decision at odds with the Uniform Fraudulent Transfer Act (UFTA) and established Wisconsin agency law; and (3) failed to consider public policy factors. We disagree with Methodist Manor's contentions and conclude that the trial court's award of summary judgment was proper. Accordingly, we affirm.

## I. BACKGROUND.

¶ 2. This appeal arises out of a lawsuit filed by Methodist Manor against Py and Ray, Py's granddaughter who had power of attorney for Py.[1] In its complaint,

---

[1] Py passed away while this action was pending in the trial court. Following the summary judgment proceedings, Methodist Manor voluntarily dismissed its breach of contract claim

504

Methodist Manor claims it is owed money for care and services it provided to Py. Methodist Manor further claims Ray intentionally interfered with Methodist Manor's contractual rights when she converted Py's assets and income to herself or others—assets and income Methodist Manor claims it was due under its contract with Py.

¶ 3. Methodist Manor is a licensed nursing care and assisted living facility. Py entered into a written agreement with Methodist Manor, pursuant to which Methodist Manor was to provide for the residency and care of Py in accordance with the agreement's terms, and Py, in turn, was to pay Methodist Manor $2450.00 per month. The agreement contained a clause that Py would not deplete her assets "by gifts or other inappropriate transfers or purchases which would endanger [her] ability of continued self-support."

¶ 4. Methodist Manor contends that at the time of Py's admission to its facility, financial information provided in a Confidential Financial Statement signed by Ray reflected that Py had liquid assets of $259,000.00. This amount was supplemented during Py's stay at Methodist Manor by an additional sum of $76,744.42, which Py received from social security and annuity income. As a result, from the total of $335,744.42, Py was to pay Methodist Manor for her residency and care. Py paid Methodist Manor $87,883.88; however, Methodist Manor contends that it has an outstanding balance of approximately $32,700.00 for services and care rendered to Py.

---

against Py without prejudice and did not commence proceedings against Py's estate, given that the collectible assets were transferred prior to Py's death. The dismissal of the breach of contract claim is not an issue in this appeal.

¶ 5. During the relevant time frame, Ray was in possession of Py's checkbook and met with Py at least on a weekly basis to pay bills and receive instructions from Py regarding Py's various accounts. Py would also instruct Ray as to any additional amounts she wished to have withdrawn from her accounts for miscellaneous items such as clothing, stationery, stamps, and other personal items. Py also frequently requested that Ray bring varying amounts of cash to Py. Ray claims to have inquired of Py on several occasions why Py needed the additional funds, to which Py would tell Ray it was none of Ray's business. After Py told her this, Ray made no further inquiries, and instead, followed Py's instructions and delivered the sums of cash, ranging from $500.00 to $5,000.00. According to Ray, during the relevant timeframe, Py "was in very good mental condition, knew the circumstances surrounding her bills and financial obligations, and insisted upon directing her own financial affairs."

¶ 6. Ray denied using any of Py's funds or giving any of Py's funds to Ray's immediate family, brothers and sister, relatives, or friends. Ray further denied receiving any substantial amounts of money from Py; however, she admitted to knowing that Py was running out of money prior to her death. Ray averred that she has no knowledge as to how Py disposed of the sums of money that Ray transferred to her.

¶ 7. Both parties moved for summary judgment.[2] In its written order following the hearing, the trial court concluded: (1) that there was no evidence that

---

[2] The record contains Methodist Manor's brief in support of its motion for summary judgment, along with Py and Ray's brief in opposition to Methodist Manor's motion for summary judgment and in support of their motion for summary judgment. No further briefing is included in the record.

Ray "intentionally controlled or took property belonging to the owner, Defendant, Ruth Ann Py"; (2) that there was no evidence that Ray "controlled or took property without the consent of the owner, Defendant, Ruth Ann Py"; (3) that there was no evidence that Ray "took action with respect to the property that seriously interfered with the right of the owner, Defendant, Ruth Ann Py, to possess the property"; (4) the facts submitted showed that Ray had Py's consent at all times and that Ray's actions did not interfere with Py's right to possess the property; and (5) that there was no evidence that Ray converted Py's funds and that consequently, Methodist Manor failed to establish the elements necessary for a claim of conversion.

¶ 8. Consequently, the trial court denied Methodist Manor's motion for summary judgment and granted Ray's motion for summary judgment, dismissing her from the lawsuit. This appeal follows.

## II. ANALYSIS.

¶ 9. Methodist Manor contends that the trial court erred when it granted summary judgment to Ray. In an appeal from the entry of summary judgment, this court reviews the record *de novo,* applying the same standard and following the same methodology required of the trial court under WIS. STAT. § 802.08 (2005–06).[3] *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). In *Preloznik v. City of Madison,* 113 Wis. 2d 112, 334 N.W.2d 580 (Ct. App. 1983), we set out the methodology to be used in summary judgment:

---

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[T]he court, trial or appellate, first examines the pleadings to determine whether claims have been stated and a material factual issue is presented. If the complaint . . . states a claim and the pleadings show the existence of factual issues, the court examines the moving party's affidavits for evidentiary facts admissible in evidence or other proof to determine whether that party has made a prima facie case for summary judgment. To make a prima facie case for summary judgment, a moving defendant must show a defense which would defeat the claim. If the moving party has made a prima facie case for summary judgment, the court examines the affidavits submitted by the opposing party for evidentiary facts and other proof to determine whether a genuine issue exists as to any material fact, or reasonable conflicting inferences may be drawn from the undisputed facts, and therefore a trial is necessary.

Summary judgment methodology prohibits the trial court from deciding an issue of fact. The court determines only whether a factual issue exists, resolving doubts in that regard against the party moving for summary judgment.

*Id.* at 116 (citations omitted). "Generally, when both parties move for summary judgment and neither argues that factual disputes bar the other's motion, the practical effect is that the facts are stipulated and only issues of law are before us." *Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶ 11, 257 Wis. 2d 809, 652 N.W.2d 806 (citations and internal quotation marks omitted).

## A. *Methodist Manor does not have a conversion cause of action against Ray.*

¶ 10. Methodist Manor argues that the *Martin* case supports its conversion claim against Ray. Methodist Manor claims that, contrary to the holding in

508

*Martin*, the trial court concluded that it lacked standing to bring an action for conversion against Ray.

¶ 11. In *Martin*, Methodist Manor of Waukesha filed suit against a patient's son alleging that the son converted his mother's, a patient of Methodist Manor of Waukesha, funds depriving it of the amounts it was due pursuant to its written agreement with the patient. *Id.*, 255 Wis. 2d 707, ¶ 4. Methodist Manor of Waukesha claimed that the son was the patient's attorney-in-fact and the joint holder with her of a bank account. *Id.* In addition, Methodist Manor of Waukesha alleged that the son, as the patient's agent, received the patient's income derived from the Social Security Administration and from other undisclosed sources, and that instead of using the money for the patient's care and residency, converted it for himself or others. *Id.* The issue presented in that case was "whether a person who is not a patient or an 'accommodated person' but who has control over funds belonging to the patient or accommodated person is liable to the nursing home facility for conversion if he or she diverts the funds for his or her own use." *Id.*, ¶ 6. The *Martin* court went on to conclude that liability would ensue based on the allegations. *Id.*

¶ 12. The decision in *Martin* is inapposite to the circumstances presented. Here, there is no evidence that Ray took Py's money and converted it to Ray's own use or that Ray received funds that were to be applied to the cost of Py's care. Instead, the undisputed facts reveal that Ray simply followed Py's instructions in delivering to Py the amounts of money she requested. When Py executed the power of attorney document, an agency relationship was created with Ray as the agent

and herself as the principal.[4] *See* WIS. STAT. §§ 243.07, 243.10; *Losee v. Marine Bank*, 2005 WI App 184, ¶ 16, 286 Wis. 2d 438, 703 N.W.2d 751 (" 'It is a well-established tenet of agency law that an attorney-in-fact has a fiduciary obligation to the principal.' " (citation omitted)). Ray's conduct, unlike that alleged on the part of the son in *Martin*, comported with Ray's fiduciary responsibilities as agent, first and foremost, to Py, as her principal. *See Bockemuhl v. Jordan*, 270 Wis. 14, 18, 70 N.W.2d 26 (1955) ("Absolute fidelity and loyalty to the interests of his [or her] principal is the first duty and the highest obligation of an agent." (citation omitted)). Due to this critical distinction, Methodist Manor's contention that the trial court failed to properly interpret and apply the *Martin* decision fails.

■

¶ 13. In addition, Methodist Manner argues that, according to *Martin*, the "general rule" of agent non-liability to third persons does not apply here. *See Martin*, 255 Wis. 2d 707, ¶ 9 n.2. This argument is based on the *Martin* court's conclusion that the general rule did not apply to the facts before it. *Id.* Again, we point out that the facts before this court are distinguishable from the facts before the *Martin* court where the son wrongly diverted monies designated for his mother's care for his own use. *Id.*, ¶ 9. Here, in contrast, Methodist Manor has presented no such evidence to support its contention that the circumstances surrounding this appeal should be distinguished from the general rule. Consequently, we conclude that the general rule of agent non-liability is applicable.

---

[4] The power of attorney document is not in the record. However, neither party disputes that Py appointed Ray as her durable power of attorney.

¶ 14. The jury instruction on conversion provides:

> A conversion is committed by a person who without consent of the owner (controls) (takes) property of another in such a way that it seriously interferes with the right of the owner to control the property permanently or for an indefinite period of time. Before you may find that (defendant) committed a conversion of property belonging to (owner), you must find the following:
>
> 1. That (defendant) intentionally (controlled) (took) property belonging to (owner);
>
> 2. That (defendant) (controlled) (took) the property without the consent of (owner) or without lawful authority; and
>
> 3. That (defendant)'s act with respect to the property seriously interfered with the right of (owner) to possess the property.
>
> Wrongful or unlawful intent is not an element of conversion. Thus, it is not necessary that (defendant) knew that (owner) was entitled to possession of the property or that (defendant) intended to interfere with (owner)'s possession. It is simply enough that (defendant) intended to deal with the property in a way that would seriously interfere with (owner)'s possession. Thus, a person may be liable for conversion where the person has exercised control over property even though he or she may be unaware of the existence of the rights with which he or she interferes.

Wis JI—Civil 2200. Methodist Manor has not presented any facts that could lead this court to conclude that the elements of conversion are satisfied. *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2001 WI App 148, ¶ 48, 246 Wis. 2d 933, 632 N.W.2d 59, *aff'd,* 2002 WI 80, 254 Wis. 2d 77, 646 N.W.2d 777 (party opposing summary judgment may not rely on conjecture but

must affirmatively "counter with evidentiary materials demonstrating there is a dispute").

¶ 15. In this regard, we agree with the trial court's thoroughly articulated reasoning:

> Well conversion is if Miss Ray intentionally took property belonging to the owner. Whose money are we talking about? We're talking about Ruth Ann Py's money. We're not talking about Methodist Manor Health Center's money. No question Ruth Ann Py owed money to Methodist Manor for what Methodist Manor provided them with. But until the money is turned over to Methodist Manor, that money is Ruth Ann Py's.

> And then the second element of conversion is [if] the defendant controlled or took the property without the consent of the owner.

> What does the evidence in this case show? The only evidence submitted on summary judgment is that the defendant ... Nadine Ray did what her principal wanted her to do.

> So first of all, there is no evidence submitted to this court that Nadine Ray took any property that belonged to Methodist Manor. There is no evidence that she took or controlled any property of Ruth Py without Ruth Py's consent. All the evidence submitted says I did what you wanted me to. I never used it for my own usage.

> The third element of conversion is [whether] the defendant's acts with respect to the property seriously interfered with the right of the owner to possess the property.

> The only evidence we have in this case is that the defendant's acts with respect to the property was to do what the principal wanted her to do.

*See Bass v. Ambrosius,* 185 Wis. 2d 879, 883 n.3, 520 N.W.2d 625 (Ct. App. 1994) (noting that although "review is *de novo,* the rationale underlying a trial court's decision on summary judgment is often extremely helpful to our analysis").

¶ 16. Methodist Manor argues that the trial court required it to prove that Ray converted the money "for her own use" as another element to sustain an action for conversion. Based on our review of the record, we do not find support for this argument. Rather, we conclude that the trial court was simply emphasizing that Ray acted according to Py's wishes and that there was no evidence that Ray converted Py's money. Methodist Manor overemphasizes the trial court's remarks to the effect that there was no evidence that Ray converted Py's money to her own use in arguing that the court required an additional "personal benefit" element to prove a claim of conversion.[5] In all likelihood, the trial

---

[5] Likewise, Methodist Manor's argument that the trial court "indic[a]ted that criminal, or quasi-criminal conduct would be required for Methodist Manor to maintain any action against Ray," is without support in the record. The transcript from the motion hearing reveals the following exchange occurred:

> THE COURT: And in essence, conversion is pretty close to criminal. I don't see that here.
>
> [METHODIST MANOR'S ATTORNEY]: Well I also submitted to the court the jury instruction on conspiracy.
>
> THE COURT: Conspiracy is a combination of two or more persons acting together to accomplish some unlawful purpose. What crime was committed here?
>
> [METHODIST MANOR'S ATTORNEY]: Well it's unlawful to breach a contract when you –
>
> THE COURT: You're not honestly saying it's unlawful, that it's criminal to breach a contract?

court made this statement to further distinguish the facts at hand from those present in *Martin* where the son did divert his mother's money for his own use. *Id.,* 255 Wis. 2d 707, ¶ 9.

**B.** *Methodist Manor has not established how the Uniform Fraudulent Transfer Act supports its claim against Ray.*

■

¶ 17. Methodist Manor also argues that pursuant to UFTA, it has standing to maintain an action for conversion against Ray. *See* WIS. STAT. ch. 242. We note that Methodist Manor did not make any argument under UFTA to the trial court. Generally we deem waived arguments raised for the first time on appeal. *See, e.g., State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997). Setting aside the question of waiver, we conclude Methodist Manor's UFTA argument lacks merit.

■

¶ 18. Methodist Manor has not established how UFTA supports its claim against Ray given that, at

---

[METHODIST MANOR'S ATTORNEY]: Well that's also in the same – let me get it here.

THE COURT: The essence of a conspiracy is it's a combination to violate or disregard the law. A contract isn't the law. A contract is not a statute. A contract is an agreement. If an agreement is breached, you have a civil cause of action.

Our review of the record leads us to conclude that the trial court was fully cognizant that a civil cause of action was before it and that the trial court did not require Methodist Manor to establish criminal or quasi-criminal conduct on Ray's part. Indeed, in its detailed written order, the trial court addressed each of the required elements for a conversion cause of action before concluding that the required elements were not met.

most, UFTA potentially supports a claim by it against Py. As Methodist Manor writes in its brief, UFTA "prohibits the principal, Py, from transferring assets so as to render herself insolvent." From this, Methodist Manor extrapolates that "[i]f the trial court's decision in this case is allowed to stand, the Court will have created a back door way around the Fraudulent Transfer Act. A debtor could thereby evade responsibility by simply having the fraudulent transfers performed by an agent under a durable power of attorney." If there are any perceived shortcomings in the statutes, and we do not conclude that there are in this instance, we remind counsel that it is the function of the legislature, not this court, to resolve them. *See generally State ex rel. U.S. Fid. & Guar. Co. v. Smith*, 184 Wis. 309, 316, 199 N.W. 954 (1924).

*C. Public policy factors do not lead this court to conclude that Methodist Manor's action against Ray was improperly dismissed following summary judgment.*

¶ 19. In addition, Methodist Manor argues that public policy considerations require that liability be imposed on Ray to "help prevent future harm to others similarly situated" to Methodist Manor in this instance. We are not convinced.

¶ 20. Methodist Manor cites *Brooks v. Bank of Wisconsin Dells*, 161 Wis. 2d 39, 467 N.W.2d 187 (Ct. App. 1991), to support its argument that Ray is liable for the acts she committed, which caused it harm. In *Brooks*, beneficiaries of a payable on death certificate of deposit filed suit against the Bank of Wisconsin Dells and one of its officers, who was the depositor's attorney-in-fact, after the officer cashed in the certificate and used the money to pay the depositor's living expenses.

*Id.* at 43. The *Brooks* court determined that whether to impose liability on the officer in his capacity as attorney-in-fact was a question of public policy. *Id.* at 48. The court then applied the following factors to conclude that the beneficiaries had stated a claim against the attorney-in-fact: "the extent to which the transaction was intended to affect the plaintiff[s], the foreseeability of harm to [them], the degree of certainty that the plaintiff[s] suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing further harm." *Id.* at 48–49 (citation omitted).

¶ 21. Methodist Manor relies on these same factors to argue that it has standing to bring a claim directly against Ray. It argues:

> Pursuant to the contract, Methodist Manor was a mandatory payee of the funds at issue. It was clearly foreseeable that if the funds were diverted by Ray, the agent, Methodist Manor stood to suffer a loss. When Ray did not convey the funds to Methodist Manor, as required by the Admission Agreement, a loss occurred. Finally, imposing liability on Ray will help prevent future harm to others similarly situated.

These conclusory statements do not convince us that public policy considerations require that we set aside well-established principles of agency law under the present circumstances. *See Losee,* 286 Wis. 2d 438, ¶ 16 (" 'It is a well-established tenet of agency law that an attorney-in-fact has a fiduciary obligation to the principal.' " (citation omitted)); *Bockemuhl,* 270 Wis. at 18 ("Absolute fidelity and loyalty to the interests of his [or her] principal is the first duty and the highest obligation of an agent." (citation omitted)).

¶ 22. We are similarly unpersuaded by Methodist Manor's argument that public policy favoring its cause of action against Ray is evident in other areas of Wisconsin law. Instead, we agree with Ray that "Methodist Manor's request for an extension of the law in this case would impose huge potential personal liability on unknowing and, in many cases, unsophisticated agents who were doing nothing more than attempting to assist an elderly parent or grandparent with their finances."

¶ 23. Based on the foregoing, we affirm the trial court's grant of summary judgment to Ray dismissing her from the lawsuit.

*By the Court.*—Judgment affirmed.