**Carolyn L. KING**

v.

**GRAND CHAPTER OF RHODE ISLAND ORDER OF the EASTERN STAR et al.**

No. 2006–133–Appeal.

Supreme Court of Rhode Island.

April 25, 2007.

---

Stephen E. Breggia, Esq., Providence, for Plaintiff.

Robert J. Quigley, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Should the courts of this state intervene in the affairs of an unincorporated private organization when a lifelong member of that organization says that she has been suspended from membership unjustly? Carolyn L. King (plaintiff or King) sought and was granted a mandatory preliminary injunction ordering the Grand Chapter of Rhode Island, Order of the Eastern Star (defendant or OES) to reinstate her membership in the organization after a justice of the Superior Court found that OES had flouted its internal disciplinary procedures when it suspended her. OES has appealed to this Court; it argues that the judiciary has no place interfering in the internal affairs of a private unincorporated organization. Additionally, the defendant contends that even if this dispute is proper grist for the judicial mill, the trial justice nonetheless abused his discretion when he issued a mandatory preliminary injunction because the circumstances of this case do not meet the heightened standard for such extraordinary relief. This case came be-

fore this Court for oral argument on February 27, 2007, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we reverse the judgment of the Superior Court.

## I

### Facts and Procedural History

This story begins with the death of one of the members of the Martha Chapter of OES, a local subordinate chapter.[1] The deceased had been in possession of certain "jewels"[2] that belonged to the Martha Chapter. In October 2003, the co-executrix of the deceased's estate gave these jewels to King for safekeeping and for return to the Martha Chapter. King, however, did not return them expeditiously.

Indeed, five months passed, and King still possessed the jewels. The Worthy Grand Matron,[3] of the Grand Chapter of Rhode Island, along with two other officers of the Grand Chapter, pulled King aside after a meeting of the local Woonsocket Chapter, to which King belonged.

1. The Order of the Eastern Star is divided into three levels: (1) The General Grand Chapter, the international organization overseeing all subordinate chapters; (2) The Grand Chapter of each state or region, which exercises supervision over several local subordinate chapters; and (3) local subordinate chapters, composed of the members in a particular city, town or area. This case involves two local chapters—the Woonsocket Chapter and the Martha Chapter—and the Grand

Chapter of Rhode Island, of which the two local subordinate chapters are a part.

2. According to the testimony in this case, the "jewels" in question were some medallions and other metallic symbols of OES.

3. The Worthy Grand Matron is the highest elected officer in the Grand Chapter. The highest elected officer of the local chapters is the Worthy Matron.

The officers expressed their concern that plaintiff still had the jewels. The jewels were returned to the Martha Chapter the next day.

Despite the safe return of the jewels, the Worthy Grand Matron determined that she should pursue disciplinary action against King because she retained possession of the jewels for an impermissibly long period. On April 20, 2004, the Worthy Grand Matron called King to inform her that a meeting of the jurisprudence committee[4] of the Grand Chapter would be held the next evening and that King's presence was requested. The following day, the Worthy Grand Matron made another phone call to King to remind her of the meeting. Nevertheless, King begged off and did not attend, citing a scheduling conflict with another OES function.

On April 22, 2004, the day after the meeting of the jurisprudence committee, the Worthy Grand Matron sent a letter to plaintiff describing what had taken place at the meeting. The letter said that, as punishment for withholding the jewels, the jurisprudence committee had recommended that King be suspended from OES for a period of six months. It then went on to say that the Worthy Grand Matron had accepted that recommendation. In response, on August 3, 2004, King penned a handwritten letter to the Worthy Grand Matron in which she requested a copy of the charges against her. She also asked that the appeal of her suspension be heard on August 17, 2004, with her lawyer present.

The correspondence battle escalated with a letter to King from the Worthy Grand Matron on August 12, 2004. In that letter, the Worthy Grand Matron indicated that the appeal would not be heard on August 17, but rather on October 9, 2004, during the annual meeting of the Grand Chapter. That letter was quickly followed by an August 23, 2004 letter from the Worthy Grand Matron to inform King that the jurisprudence committee would meet on September 7, 2004, with regard to her suspension and that King's presence was requested.

King attended the meeting of the jurisprudence committee, but, once again, the committee recommended a suspension of six months. That recommendation once again was adopted by the Worthy Grand Matron. And, once again, King followed up with written correspondence. In this undated letter, King characterized her suspension as illegal and she asked for written apologies from, as well as the suspension of, certain other OES officers. The Worthy Grand Matron replied with a letter written September 22, 2004, defending the suspension and refusing to acquiesce to any of King's demands for resolution of the matter. Rather, the Worthy Grand Matron asked that plaintiff agree to end all discussion on the matter and accept reinstatement on October 22, 2004—the conclusion of the initial six-month period of suspension. King was not mollified, however, and she continued to work to reverse her suspension. Apparently, the Worthy Grand Matron did not appreciate King's continuing efforts. Thus, she sent yet another letter on October 6, 2004, informing King that her suspension would continue indefinitely and that her appeal would not be heard.

On March 3, 2005, King responded by filing the complaint that gives rise to this appeal. In her complaint, King requested damages for slander and injunctive relief.

---

4. According to the OES constitution, the jurisprudence committee is a standing committee with the primary role of providing recommendations to the Worthy Grand Matron about how to answer questions presented to her.

As part of her request for injunctive relief, King sought a preliminary injunction that would require OES to reinstate her while the litigation was pending. A hearing was held before a justice of the Superior Court over seven days between May 18, 2005, and August 19, 2005. At the conclusion of the testimony, the hearing justice found that OES had not followed the rules set forth in its constitution for disciplining its members. Furthermore, he found that King had a substantial interest in maintaining her membership with OES because it had been a major part of her life during her nearly four decades as a member. Thus, he determined that a preliminary injunction was warranted to reinstate King. OES timely appealed.[5]

## II

### Standard of Review

 A hearing justice's decision to issue a preliminary injunction is reviewed by this Court for abuse of discretion. *Richmond Realty, Inc. v. Town of Richmond*, 644 A.2d 831, 832 (R.I.1994). "The primary factors a trial justice must consider in granting a preliminary injunction are a showing of irreparable harm to plaintiff, plaintiff's substantial likelihood of success on the merits, balancing the parties['] interests, and preserving the status quo." *Paolissi v. Fleming*, 602 A.2d 551, 551 (R.I.1992) (mem.). When a preliminary injunction is mandatory in nature in—that it commands action from a party rather than preventing action—a stricter rule applies and such injunctions should be issued only upon a showing of "very clear" right and "great urgency." *Giacomini v. Bevilacqua*, 118 R.I. 63, 65, 372 A.2d 66, 67 (1977) (quoting *Smart v. Boston Wire*

*Stitcher Co.*, 50 R.I. 409, 415, 148 A. 803, 805 (1930)).

## III

### Analysis

As we see it, our review here is twofold. First we must determine whether the circumstances warrant judicial intervention into the affairs of an unincorporated private organization. Then, if the answer to that inquiry is affirmative, we must determine whether the hearing justice properly applied the standard for issuing a mandatory preliminary injunction. Our analysis leads us to conclude that the hearing justice was correct when he determined that this matter was properly before the court. However, because we hold that the hearing justice did not make a finding of great urgency—as required for the issuance of a mandatory preliminary injunction—it is our opinion that the mandatory preliminary injunction must be vacated and the case should be remanded for trial.

### A

### Judicial Intervention

OES is a private unincorporated organization. Members of the organization are required to pay dues and, in turn, they are allowed to participate in the various social and philanthropic activities of the organization. OES contends that it is beyond the province of the courts to interfere with the internal affairs of a private organization. King, on the other hand, maintains that when an organization either ignores its own rules or applies those rules arbitrarily or capriciously, resulting in harm to one of its members, then the sole recourse is to the courts.

---

5. Although a preliminary injunction is an interlocutory order, G.L.1956 § 9–24–7 provides for a direct appeal to this Court.

■ It is well settled that, ordinarily, the courts will not interfere with the internal workings of a voluntary organization as long as such rules are reasonable and consistent with public policy. *See, e.g., Gorman v. St. Raphael Academy*, 853 A.2d 28, 37 (R.I.2004) ("there should be 'no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion' ") (quoting *Hebert v. Ventetuolo*, 480 A.2d 403, 407 (R.I.1984)); *Del Ponte v. Societa Italiana Di M.S. Guglielmo Marconi*, 27 R.I. 1, 7, 60 A. 237, 240 (1905) (upholding the decision of a voluntary organization to expel members for violating one of the organization's by-laws because the rule and the application of the rule were reasonable); *Levant v. Whitley*, 755 A.2d 1036, 1043 (D.C.2000) (acknowledging a " 'general rule' " against judicial interference in private voluntary membership associations); *N.A.A.C.P. v. Golding*, 342 Md. 663, 679 A.2d 554, 558 (1996) ("We note at the outset that as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization."); *Hammer v. American Kennel Club*, 304 A.D.2d 74, 758 N.Y.S.2d 276, 278 (N.Y.App.Div.2003) ("generally, the internal decision-making and rule adoption of private organizations, involving the conduct of their members and their activities, are outside the realm in which courts exercise their authority"). However, each of the cases that espouse this general rule acknowledges exceptions. *See Hebert*, 480 A.2d at 407 (arbitrary and capricious); *Del Ponte*, 27 R.I. at 7, 60 A. at 240 (unreasonable application); *Lavalle v. The Societe of St. Jean Baptiste de Woonsocket*, 17 R.I. 680, 684, 24 A. 467, 468 (1892) (money

interest); *Hammer*, 758 N.Y.S.2d at 278 (violation of state law).

A review of the case law reveals that the cases that have come before appellate courts in which the issue is the incursion of the judiciary into the internal affairs of a private unincorporated association fall into two categories. The first involves the structure and nature of the association's rules themselves, and the second concerns the application of facially reasonable rules to a particular member.

The cases that have been decided by this Court about when judicial intrusion into the affairs of private voluntary associations is permissible generally have fallen into the first category—analyzing whether the rules themselves are arbitrary and capricious. At the beginning of the twentieth century, this court decided three cases on this subject: (1) *Lavalle*, (2) *Pepin v. Societe St. Jean Baptiste*, 24 R.I. 550, 54 A. 47 (1902), and (3) *Del Ponte*. Both *Lavalle* and *Pepin* dealt with the same association, one in which members paid dues that created a fund from which members could receive payment in the event of illness. *Pepin*, 24 R.I. at 551–52, 54 A. at 48. In that case, this court justified judicial resolution of the dispute between the association and its members because it found that the potential payment of benefits from the fund resulted in "a contract in the nature of a property right." Id. at 552, 54 A. at 48. Subsequently, in *Del Ponte*, even though this Court upheld the decision of the private organization to expel some of its members, it nevertheless held that it was authorized to adjudicate the matter to determine whether the rules promulgated by the organization were reasonable and that those rules were applied reasonably. *Del Ponte*, 27 R.I. at 7, 60 A. at 240.[6]

---

**6.** The corporation, therefore, had the right to establish by-laws providing for the expulsion of members transgressing their reasonable

provisions. Is this provision for expelling members, 'For defaming the members of the Directive Council or any member whatsoever

A seminal case that contemplates the role of courts in the affairs of private organizations is *Hebert*. In that case, two high school hockey players were placed under guardianship with the result being that their new legal address placed them in a different high school. *Hebert*, 480 A.2d at 404–05. The principal of the new high school suspended the students from playing on the hockey team—without a hearing or giving them a reason—because he suspected that they had obtained guardianships for the sole purpose of playing on the hockey team at that school, which he believed to be a violation of the interscholastic league rules. *Id.* at 405. The students brought suit, and the case eventually came before this Court. *Id.* One of the questions posed to this Court was "whether the league, a voluntary non-profit organization, may promulgate and enact rules governing the eligibility of transfer students to participate in interscholastic sports * * *." *Id.*

We answered this question in the affirmative, and, in the process of doing so, took the opportunity to make a statement about the propriety of judicial intervention in the internal affairs of private, voluntary organizations:

> "It has been well established that there should be no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion. * * * When such rules and by-laws are reasonable, they become binding upon the association members. * * * Where such rules are reasonable and in keeping with public policy, there

will be no judicial interference with them." *Hebert*, 480 A.2d at 407.

A common thread running through all these cases has been the unwillingness of courts to inject themselves into the internal affairs of private organizations when the rules of those organizations are reasonable and do not violate public policy. *See Gorman*, 853 A.2d at 37. The dispute between King and OES, however, does not turn on whether OES had reasonable rules with regard to discipline, but whether OES applied those rules arbitrarily and capriciously to King.

The only Rhode Island case that touches on this issue is *Del Ponte*. In that case, in addition to determining that the rules promulgated by the society were reasonable, this Court also evaluated whether the conduct of the members that allegedly ran afoul of the rules fit reasonably within them—and we held that it did. *Del Ponte*, 27 R.I. at 7, 60 A. at 240. Faced with a relative dearth of precedent from this Court, we find it helpful to examine the manner in which some of our sister states have approached this issue.

In *Golding*, 679 A.2d at 558, the Maryland Supreme Court was asked to determine the legality of a national organization's interpretation of an internal rule that resulted in a limitation of junior members' ability to vote in local chapter elections. That court first explained its well-established rules relating to incorporated associations—no interference with foreign corporations, and application of the business judgment rule for domestic corporations—and then went on to analyze the competing judicial doctrines used to determine when judicial intervention was war-

---

for reasons connected with the society, causing dissension and disorders in the midst of the association,' a reasonable one? We think that it is[.] * * * Does the article published by the petitioners fall within the acts prohibit-

ed by the terms of the by-law, * * *? We think it does. *Del Ponte v. Societa Italiana Di M.S. Guglielmo Marconi*, 27 R.I. 1, 7, 60 A. 237, 240 (1905).

ranted with respect to private unincorporated associations. *Id.* at 558–62. From this discussion, the Maryland court discerned that the courts of the various states have justified judicial intervention in situations in which property rights and civil rights are concerned, and also have confronted the question by applying contractual principles to membership agreements, extending the business judgment rule to unincorporated organizations, enforcing a fiduciary duty of the association to its members, or balancing the seriousness of the injury against the importance of the association's right of autonomy. *Id.* at 560–61. *See also California Dental Association v. American Dental Association,* 23 Cal.3d 346, 152 Cal.Rptr. 546, 590 P.2d 401, 406 (1979) (balancing test); *Van Daele v. Vinci,* 51 Ill.2d 389, 282 N.E.2d 728, 731 (1972) (pecuniary interest); *State ex rel. Givens v. Superior Court of Marion County,* 233 Ind. 235, 117 N.E.2d 553, 556 (1954) (civil rights); *Falcone v. Middlesex County Medical Society,* 34 N.J. 582, 170 A.2d 791, 799 (1961) (fiduciary duty); *Combs v. Texas State Teachers Association,* 533 S.W.2d 911, 913 (Tex.Civ.App.1976) (contractual principles). The Maryland court then went on to analyze its decisions in the area and came to the conclusion that, in addition to intervening when an economic interest is at stake, it would "review the decisions of a voluntary private organization [when] fraud, arbitrary action, bad faith, or other wrongful conduct" is present. *Golding,* 679 A.2d at 562.

■■ After examining these cases, we are persuaded that there is wisdom in providing a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations. Our belief in the propriety of this position is bolstered by our statement in *Hebert* that "[w]hen

such rules and by-laws [adopted by the association] are reasonable, they become binding upon the association members." *Hebert,* 480 A.2d at 407. Both the rank and file members and the officers are "members" of the organization, and reasonable rules are equally binding on them. Thus, we hold that the arbitrary and capricious application of otherwise reasonable rules does warrant judicial incursion into the affairs of a private, voluntary organization. The constitutions, bylaws, and rules of private organizations create a legally enforceable agreement in the nature of a contract between the organization and the member because of corresponding mutual obligations—by the member to follow the rules of the organization, and by the organization to fairly apply those rules. Therefore, judicial interference will sometimes be necessary to enforce those rights and obligations.

■ King and OES direct our attention to various sections of the OES constitution and bylaws that they each contend provide the proper disciplinary procedures to be followed. OES suggests that Articles VII and IX of the OES constitution control. In particular, it asserts that there is specific language in section 1 of Article VII that provides the Worthy Grand Matron with the discrete authority to suspend King. It says:

"[The Worthy Grand Matron] has the authority to convene any Subordinate Chapter * * *, to preside therein, to inspect the proceedings, and to require obedience to the laws of the Order; to suspend for good cause, until the next Annual Session of the Grand Chapter, or for a limited time, any Subordinate Chapter, * * *.

"She shall decide all questions of law or usage submitted to her, subject, however, to an appeal to the Grand Chapter, and until such decision or opinion is

reversed by the Grand Chapter, they shall be in force and binding as between the parties thereto."

Further, OES directs us to language contained in Article IX that it maintains provides additional justification for the action taken. That language, section 1 of Article IX, which details the duties of the jurisprudence committee, is as follows:

"It shall be the duty of the Committee on Jurisprudence to consider and report upon all questions involving the law and usages of the Order and upon such other matters as deemed necessary, at the request of the Grand Chapter, Worthy Grand Matron, and/or Worthy Grand Patron. It shall also be the duty of the Committee on Jurisprudence to examine all matters of controversy and grievance when presented to them by the Worthy Grand Matron, or the Grand Chapter, and to report with such recommendations as they may deem proper."

Conversely, King suggests that Article XVI of the "Rules and Regulations" controls because that section, entitled "Complaints and Trial," sets out very specific rules for disciplining members. In particular, section 1 of Article XVI grants the various subordinate chapters "the power to discipline its members for immoral conduct, violation of the laws and regulations, and breaches of decorum in open Chapter, and may reprimand, suspend or expel, with the concurrence of two-thirds (2/3) of the members present." Furthermore, section five requires that all charges be written and read in open chapter, and section six requires written notice of the date and time for trial must be sent to the accused member at least fifteen days in advance. Finally, section eleven mandates that "[a]ll charges must be heard and decided by the Chapter."

The hearing justice found that the propriety of any discipline meted out to King should have been considered under the provisions of Article XVI and that neither Article VII nor Article IX gave the Worthy Grand Matron the authority to suspend King. He analyzed the disciplinary procedures detailed in Article XVI and determined that OES did not abide by its own rules and that King was not afforded the procedural safeguards provided in the OES constitution and bylaws.

■ Findings of fact made by a justice sitting without a jury are given great deference, and we will not disturb them unless they are clearly wrong or overlook or misconceive material evidence. *Kilona Crown Jewelers, Inc. v. Wharfside Associates Limited Partnership,* 651 A.2d 1231, 1232 (R.I.1994) ("This [extreme] deference is also given to a judge's determination on mixed questions of law and fact."). However, contract interpretation is a question of law that we review *de novo. Zarrella v. Minnesota Mutual Life Insurance Co.,* 824 A.2d 1249, 1259 (R.I.2003). Our review of the relevant provisions of the OES constitution leads us to the conclusion that the hearing justice's decision about which provisions establish the disciplinary procedure of OES is sound. Article XVI is detailed in its outline of the process required when adjudicating a charge of misconduct by a member of the organization. Articles VII and IX, on the other hand, are broad statements of the respective duties and powers of the Worthy Grand Matron and the jurisprudence committee. To the extent that the power to suspend is conferred upon the Worthy Grand Matron, that power is clearly limited to the suspension of a Subordinate Chapter—not an individual member. We see no reason to disturb the hearing justice's decision that the organization was required to follow the strictures of Article XVI when imposing discipline on a member of OES.

Furthermore, the hearing justice's conclusion that these rules were not followed is equally justified. King did not receive adequate notice under Article XVI when the Worthy Grand Matron first convened the jurisprudence committee, the charges against her were not provided to her in writing, her case was not tried in open chapter, and she was denied the right to an appeal before the Grand Chapter. In our opinion, the hearing justice correctly found that OES failed to follow its own guidelines for disciplining a member.

██ A private voluntary organization is entitled to make its own rules and bylaws as long as they are not arbitrary and capricious. *See Hebert*, 480 A.2d at 407. However, once those rules have been established, they bind the organization as well as its members. *See id.* The disciplinary procedures established by OES are not arbitrary and capricious, but are, in fact, commendable procedural protections for members accused of violating the rules of the organization. However, OES simply ignored those protections with regard to King, and it acted arbitrarily and capriciously in the proceedings disciplining her. It is only under these circumstances that judicial interference in the affairs of a private voluntary organization is warranted. Therefore, we hold that the hearing justice properly asserted judicial authority over this dispute.

### B

### Mandatory Preliminary Injunction

In her request for a preliminary injunction, King asserted that she would suffer irreparable harm because of the unique nature of the benefit she received through her participation in the activities of OES. She also argued that she had a clear right to the remedy she sought, the balance of the parties' interests weighed in favor of granting the injunction, and that the status quo would be preserved by granting the injunction.

██ The trial justice properly articulated the onerous standard for granting a preliminary injunction that is mandatory in nature:

> "Parties seeking such relief must establish first that there is a likelihood of success on the merits of the underlying complaint; second, that irreparable harm will result if injunctive relief is not granted; third, that the balance of the equities in the public interest is served by injunctive relief; and, fourth, that the status quo between the parties will most likely be maintained by the injunctive relief sought. * * * 'When an injunction mandatory in its nature is asked for, a stricter rule obtains than when an injunction that preserves the status quo is sought. Owing to the extraordinary character of the remedy, it should be granted on preliminary application only in cases of great urgency, and when the right of the complainant is very clear[.]' " *See Giacomini*, 118 R.I. at 65, 372 A.2d at 67.

The hearing justice concluded that King had met the strict standard for mandatory injunctive relief. In so doing, he cited the fact that King had a four-generation legacy with OES and had herself been a member for nearly four decades, that the suspension was devastating and disruptive to her, that she clearly had been denied the procedural safeguards provided by the OES constitution, that the indefinite suspension ultimately imposed on plaintiff was retaliatory in nature, and that the denial of her right to appeal left any further pursuit of the matter internally futile. However, even though the hearing justice's reasoning was well articulated and thoughtful, at no time did he find that there was great urgency justifying the relief sought.

We will disturb a hearing justice's decision to grant a preliminary injunction only when he has abused his discretion. *See Richmond Realty, Inc.*, 644 A.2d at 832. This Court often has held the granting of mandatory preliminary injunctive relief to be a troubling and vexatious issue, and we have no desire to loosen that standard here. *See Pine v. Kalian,* 723 A.2d 804, 805 (R.I.1998) (mem.) (" '[W]hen an injunction mandatory in the nature is asked for, a stricter rule obtains. Owing to the extraordinary character of the remedy it should be granted on preliminary application only in cases of great urgency and when the right of the complainant is very clear.' ") (quoting *Smart* 50 R.I. at 415, 148 A. at 805); *see also Giacomini* 118 R.I. at 65, 372 A.2d at 67. Thus, it remains, that in the absence of a showing of "great urgency," a mandatory preliminary injunction cannot be granted. *See Giacomini,* 118 R.I. at 65, 372 A.2d at 67.

The hearing justice did not make an explicit finding of great urgency; nor is such a finding implicit in the reasoning of his decision. Furthermore, our thorough review of the record leads us to conclude that King did not meet that standard. Therefore, we are constrained to hold that the hearing justice erred when he granted the mandatory preliminary injunction, and it must be vacated.

We are further persuaded by the decisions of other courts that disfavor preliminary relief that is essentially identical to the ultimate relief sought, as is the case here. *See Crowley v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers,* 679 F.2d 978, 995 (1st Cir.1982) ("a preliminary injunction * * * shall not grant the ultimate relief sought"); *see also SW Industries, Inc. v. Aetna Casualty & Surety Co.,* 646 F.Supp. 819, 823 (D.R.I. 1986) ("Preliminary injunctions of a mandatory nature are particularly disfavored when their effect would be to grant the ultimate relief sought by the moving party."). It is precisely because of these concerns that the stricter rule, requiring a "very clear" right and "great urgency," adheres to the determination of the propriety of a mandatory preliminary injunction. In the absence of these extraordinary circumstances, to grant the relief preliminarily runs the risk of deciding the merits of the request for final relief at a preliminary stage.[7]

## IV

### Conclusion

For the reasons stated in this opinion, we affirm the decision of the Superior Court that held that this dispute created a cognizable cause of action before the court. However, we reverse the order of the Superior Court granting a mandatory preliminary injunction, and the papers in this case shall be returned to that court.

7. Neither party moved to consolidate the application for a preliminary injunction with the trial of the action on the merits pursuant to Rule 65 of the Superior Court Rules of Civil Procedure.