Charles WILLIAMS, M.D., Plaintiff,

v.

No. 2:09–CV–00554–PMP–PAL.

United States District Court,
D. Nevada.

Feb. 25, 2010.

Jacob L. Hafter, Michael K. Naethe, Law Office of Jacob Hafter & Associates, Las Vegas, NV, for Plaintiff.

David Roger, District Attorneys Office, Lisa J. Jolly, Lynn M. Hansen, Jimmerson Hansen, Las Vegas, NV, for Defendants.

## ORDER

PHILIP M. PRO, District Judge.

Presently before the Court is Defendants' Motion for Summary Judgment as to All Claims (Doc. # 66), filed on November 12, 2009. Plaintiff filed an Opposition (Doc. # 70) on November 30, 2009. Defendants filed a Reply (Doc. # 81) on December 14, 2009.

The Court has detailed the facts in this action in the Court's concurrent Order on Plaintiff's Motion for Summary Judgment (Doc. # 53), and the Court will not repeat them here except as necessary to resolve the present motion. In this action, Plaintiff Charles Williams ("Williams") asserts against Defendants claims for due process violations under the United States Constitution (count one); antitrust violations (counts two, three, four, and five); tortious interference with business relationships and prospective business relations (count six); tortious interference with employment, trade, or profession (count seven); negligent interference with prospective economic advantage (count eight); breach of the covenant of good faith and fair dealing (count nine); negligence (count ten); defamation (count eleven); defamation per se (count twelve); libel (count thirteen); and slander (count fourteen).

Defendants now move for summary judgment on all of Williams' claims. Defendants argue that Defendant John Ellerton ("Ellerton") and Defendant Medical and Dental Staff ("Medical Staff") are not state actors, and Defendants UMC and the Board did not personally participate in any constitutional violations. Defendants also argue Williams lacks standing to bring antitrust claims. Defendants further argue that Williams has failed to present evidence on every essential element of his interference with prospective economic advantage or employment claims, Nevada does not recognize a claim for negligent interference with prospective economic advantage, and there is no contract upon which to base a claim for breach of the covenant of good faith and fair dealing. Defendants also argue they owe no duty to Williams to support a negligence claim, and the defamation-related claims must fail because the report to the NPDB was true and privileged.

Williams opposes the motion, arguing Ellerton and the Medical Staff are state actors and all Defendants personally participated in the alleged constitutional violations, either directly or by ratifying other Defendants' conduct. Williams also contends the false NPDB report affects his future prospects sufficient to support an intentional interference claim. As to the breach of the covenant of good faith and fair dealing, Williams argues he was a party to and third party beneficiary of the Bylaws, which created a contract between Williams and Defendants. Williams also argues Defendants were negligent by failing to follow county law as set forth in the Bylaws.

As to the defamation-related counts, Williams argues the NPDB report's reference to at least three instances of airway mismanagement defamed him, as only two instances of airway management were at

issue. Williams contends the report to the NPDB was not privileged because no professional review activity took place with respect to a third airway management issue. Further, Williams argues the duty to report includes a continuing duty to maintain accurate statements, and once Williams brought the report's inaccuracy to Defendants' attention, they should have amended the report.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party. *Id.*

### A. State Actors (Count One)

In a separate Order issued concurrently with this one, this Court already has ruled that Defendants Ellerton and Medical Staff are state actors when exercising the authority delegated to them by the Board. The Court therefore will deny Defendants' summary judgment motion on this basis.

### B. Personal Participation (Count One)

There is no respondeat superior liability under 42 U.S.C. § 1983. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.2002). To be liable, the defendant must have personally participated in the alleged rights deprivation. *Id.* To make this showing with respect to an entity, a plaintiff must show some custom or policy of the entity was the driving force behind the violation or the person causing the violation had final policymaking authority. *Botello v. Gammick*, 413 F.3d 971, 978–79 (9th Cir. 2005).

■ No genuine issue of material fact remains that Defendant UMC did not personally participate in the alleged constitutional due process violation. Williams' only argument for UMC's participation is that UMC locked the doors at the Fair Hearing, thus preventing Williams' witness from appearing. Although Williams argues it "became apparent" that his witness did not appear at the Fair Hearing because UMC's outer doors had been locked, Williams cites to no evidence in the record to support this statement. Williams suggested at the Fair Hearing that one of his witnesses "probably" arrived but could not get in because the doors were locked. (Pl.'s Mot. Summ. J. (Doc. # 53), Ex. U at 338.) Williams' counsel stated that he was expecting a witness to appear but she did not, and counsel did not know why she did not appear. (*Id.* at 404.)

Williams' and his counsel's speculation as to why the witness did not appear does not raise a genuine issue of material fact that UMC personally participated in a deprivation of Williams' due process rights. Williams could have provided an affidavit from the witness stating that she appeared but could not get in because UMC had locked the doors. Williams provides no such evidence, and thus it is pure specula-

tion as to why the witness did not appear. There being no evidence in the record raising a genuine issue of material fact that UMC had any personal participation in any due process violation, the Court will grant Defendants' motion for summary judgment on count one as to Defendant UMC.

As to the Board, Williams offers four bases for personal participation. First, Williams argues the Board enacted the Bylaws which amount to the Board's official policy. However, Williams does not argue the Bylaws themselves are deficient, and consequently the Bylaws are not the moving force behind any due process violation. Second, Williams argues the Board should have realized Ellerton may not follow the Bylaws and therefore should have monitored his activities more closely. Williams presents no evidence suggesting the Board should have been aware Ellerton would not follow the procedures set forth in the Bylaws.

Third, Williams argues the Board has a policy of allowing the District Attorney to deprive physicians of their due process rights by not providing requested documentation. Williams cites only to his own situation, however, and this single alleged instance does not raise a genuine issue of material fact that the Board had any such policy. *See Levine v. City of Alameda,* 525 F.3d 903, 907 (9th Cir.2008). Moreover, Williams has presented no evidence the Board even was aware of the District Attorney's correspondence with Williams' counsel, much less that this conduct reflected Board policy.

Finally, Williams argues the Board ratified any due process violations when it affirmed the MEC's final decision. While perhaps this could support a finding of personal participation, Williams has not presented any evidence that he apprised the Board of any alleged procedural irregularities. Williams thus has not presented any evidence raising a genuine issue of material fact that the Board was aware of and then ratified any due process violations. The Court therefore will grant Defendants' motion for summary judgment on count one as to Defendant Board.

### C. Standing to Bring Antitrust Claims (Counts Two, Three, Four, and Five)

 To assert antitrust claims, the plaintiff must show "not merely injury to himself as a competitor, but rather injury to competition." *Austin v. McNamara,* 979 F.2d 728, 739 (9th Cir.1992). Where there is no evidence of injury to competition, there is no cognizable antitrust injury. *Id.* Revocation of a doctor's privileges at a hospital at most "amount[s] to an informal and limited restraint on a single competitor in a single hospital," and thus does not constitute antitrust injury. *Id.* Williams does not respond to Defendants' motion for summary judgment on these claims, and thus fails to direct this Court to any evidence raising a genuine issue of material fact as to Williams' standing to bring antitrust claims. As in *Austin,* Williams presents evidence related only to injury to himself, not to competition generally. The Court therefore will grant Defendants' motion for summary judgment on counts two, three, four, and five.

### D. Intentional Interference Claims (Counts Six and Seven)

 Under Nevada law, to establish a claim for intentional interference with contractual relations, a plaintiff must establish:

(1) a valid and existing contract;

(2) the defendant's knowledge of the contract;

(3) intentional acts intended or designed to disrupt the contractual relationship;

(4) actual disruption of the contract; and

(5) resulting damage.

*J.J. Indus., LLC v. Bennett,* 119 Nev. 269, 71 P.3d 1264, 1267 (2003). To meet the second element, the plaintiff must show the defendant "knew of the existing contract, or at the very least, establish facts from which the existence of the contract can reasonably be inferred." *Id.* (quotation omitted). With respect to the third element, the defendant's "mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." *Id.* at 1268.

■■■ To establish a claim for intentional interference with prospective economic advantage, the plaintiff must establish:

(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

*Wichinsky v. Mosa,* 109 Nev. 84, 847 P.2d 727, 729–30 (1993). To establish this tort, a plaintiff "must show that the means used to divert the prospective advantage was unlawful, improper or was not fair and reasonable." *Custom Teleconnect, Inc. v. Int'l Tele–Servs., Inc.,* 254 F.Supp.2d 1173, 1181 (D.Nev.2003) (citing *Crockett v. Sahara Realty Corp.,* 95 Nev. 197, 591 P.2d 1135 (1979)).

No genuine issue of material fact remains as to either of these claims. With respect to Williams' intentional interference with contractual relations claim, Williams has presented no evidence raising

a genuine issue of material fact that any Defendant acted with the requisite intent. As to Williams' intentional interference with prospective economic advantage claim, Williams has presented no evidence as to any prospective contract between Williams and a third party, or that any Defendant was aware of such a prospective contract. Williams also has presented no evidence raising an issue of fact that any Defendant acted with the requisite intent. Although Williams requests further discovery on these claims, he has not complied with Federal Rule of Civil Procedure 56(f), and makes no effort to suggest what further discovery might reveal that would preclude summary judgment on these claims. The Court therefore will grant Defendants' motion for summary judgment on counts six and seven.

**E. Negligent Interference Claim (Count Eight)**

■■■ Williams does not respond to Defendants' motion for summary judgment on this claim. Nevada specifically has declined to recognize a tort for negligent interference with economic expectancies. *Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Local No. 226 v. Stern,* 98 Nev. 409, 651 P.2d 637, 638 (1982). As no such cause of action exists as a matter of law, the Court will grant Defendants' motion for summary judgment as to count eight.

**F. Breach of the Covenant of Good Faith and Fair Dealing (Count Nine)**

Defendants contend there is no contract between Williams and any Defendant, and thus Defendants could not have breached a covenant of good faith and fair dealing as a matter of law. Defendants further contend that even if the Bylaws could constitute a contract, this claim only could be

viable against Defendant UMC. Williams responds that many courts have held that hospital bylaws constitute a binding contract. Alternatively, Williams argues he is a third party beneficiary of the contract between the Trustees, UMC, the Medical Staff, and Ellerton consisting of the Bylaws, the Credentialing Manual, and the Fair Hearing Plan.

 In Nevada, to create an enforceable contract there must be an offer, acceptance, meeting of the minds, and consideration. *Mack v. Estate of Mack,* 206 P.3d 98, 108 (Nev.2009). Whether an enforceable contract was formed is a question of fact. *Whitemaine v. Aniskovich,* 124 Nev. 29, 183 P.3d 137, 141 (2008).

On several occasions, the Nevada Supreme Court has had before it breach of contract claims asserted by a physician in relation to the revocation of his privileges at a hospital. *See Clark v. Columbia/HCA Info. Servs., Inc.,* 117 Nev. 468, 25 P.3d 215 (2001) (psychiatrist brought tort and contract claims related to termination of his staff privileges); *Meyer v. Sunrise Hosp.,* 117 Nev. 313, 22 P.3d 1142 (2001) (physician brought breach of contract and breach of the covenant of good faith and fair dealing claims against hospital that revoked privileges for a year); *Chowdhry v. NLVH, Inc.,* 109 Nev. 478, 851 P.2d 459 (1993) (physician brought tort and contract claims related to reprimand placed in his record after temporary suspension of privileges). However, the Nevada Supreme Court resolved each case without explicitly ruling that such a claim is viable as a matter of contract law. *See Clark,* at 476–80, 25 P.3d 215 (holding defendants were not entitled to immunity under the Health Care Quality Improvement Act and remanding for further proceedings); *Meyer,* 117 Nev. at 321–29, 22 P.3d 1142 (holding defendants were entitled to immunity under the Health Care Quality Improvement Act); *Chowdhry,* 109 Nev. at 486–87, 851

P.2d 459 (noting that although jury below found no damages, jury had found the hospital breached its bylaws and thus physician had reasonable grounds to bring the action such that an award of attorney's fees was improper).

 Nevada thus has not specifically addressed whether a hospital's bylaws constitute a contract with its physicians. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865, 872 (9th Cir.2007) (quotation omitted). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." *Id.* (quotation omitted).

A split in authority exists among other courts which have addressed the issue. Some courts hold a hospital's bylaws do not create a contract between the physician and the hospital due to a lack of consideration. *See, e.g., Kessel v. Monongalia County Gen. Hosp. Co.,* 215 W.Va. 609, 600 S.E.2d 321, 326 (2004); *Zipper v. Health Midwest,* 978 S.W.2d 398, 416–17 (Mo.App.1998). These courts reason that because state law requires the hospital to enact the bylaws, the hospital had a preexisting duty, and "a promise to do that which a party is already legally obligated to do does not constitute valid consideration." *Zipper,* 978 S.W.2d at 416. Some courts also conclude there is no bargained for exchange because the physician has no input in the bylaws and the hospital has the right to change the bylaws unilaterally. *See, e.g., Zipper,* 978 S.W.2d at 416; *Miller v. St. Alphonsus Regional Med. Ctr., Inc.,* 139 Idaho 825, 87 P.3d 934, 942 (Idaho 2004).

Other courts have concluded that hospital bylaws are an enforceable contract be-

tween the hospital and the physicians granted privileges at the hospital. *See, e.g., Janda v. Madera Community Hosp.,* 16 F.Supp.2d 1181, 1184 (E.D.Cal.1998) (collecting cases); *Whalen v. Down East Community Hosp.,* 980 A.2d 1252, 1254–55 (Me.2009); *Read v. McKennan Hosp.,* 610 N.W.2d 782, 785 (S.D.2000); *Bass v. Ambrosius,* 185 Wis.2d 879, 520 N.W.2d 625, 627 (1994) (collecting cases); *Lewisburg Community Hosp. Inc. v. Alfredson,* 805 S.W.2d 756, 759 (Tenn.1991). These courts note that although the hospital has a pre-existing duty under state law to enact bylaws, it has no pre-existing duty to grant privileges to any particular physician, and the physician has no pre-existing duty to work at any particular hospital. *Lo v. Provena Covenant Med. Ctr.,* 356 Ill.App.3d 538, 292 Ill.Dec. 451, 826 N.E.2d 592, 598–99 (2005); *Janda,* 16 F.Supp.2d at 1184–85; *Virmani v. Presbyterian Health Servs. Corp.,* 127 N.C.App. 71, 488 S.E.2d 284, 287–88 (1997); *Gianetti v. Norwalk Hosp.,* 211 Conn. 51, 557 A.2d 1249, 1254–55 (1989). The physician "receives the benefit of being able to treat his patients in the hospital and the hospital receives the benefit of providing care to the physician's patients." *Janda,* 16 F.Supp.2d at 1185 (quotation omitted). Consequently, there is an exchange of consideration sufficient to support a contract. *Id.*

Some courts also have likened the force of a hospital's bylaws to a union or other association's bylaws which creates a contract between the association and its members, or to a contract created between an employer and its employees through an employee manual. *See Lo,* 292 Ill.Dec. 451, 826 N.E.2d at 598 (likening hospital staff to a trade union and concluding bylaws therefore created a contract between association and its members); *Bass,* 520 N.W.2d at 627 ("The general rule that hospital bylaws can constitute a contract between the hospital and its staff is consis-tent with the law in this state that an employee handbook written and disseminated by the employer, and whose terms have been accepted by the employee, constitutes a contract between the employer and the employee.").

The Court concludes that Nevada would adopt the view that a hospital's bylaws can create an enforceable contract between the hospital and its staff, as well as between the staff and its members. The physician makes an offer to become a member of the hospital staff by applying for privileges at the hospital. The hospital and staff accept that offer by granting the physician privileges. The parties agree their relationship will be governed by the bylaws, and thus reach a meeting of the minds as to the terms. The hospital and staff have no pre-existing duty to grant privileges to any particular physician, and the physician has no pre-existing duty to work at any particular hospital. The physician gains the benefit of treating his patients at the hospital, the hospital receives the benefit of providing care to the physician's patients, and the staff gains a member to the association. The parties thus have exchanged valuable consideration. A hospital's bylaws therefore may constitute an enforceable contract. *Cf. D'Angelo v. Gardner,* 107 Nev. 704, 819 P.2d 206, 209 (1991) (holding that employee handbook may reflect contractual obligations between employer and employee where handbook sets forth provisions related to termination for cause, the employer delivers it to the employee, the employee reads and acknowledges its contents, and the employee continues to work for employer). As to the argument that the physician cannot alter the bylaws, and thus he or she has not bargained for its terms, Nevada does not preclude the formation and enforcement of a standardized contract offered to one contracting party on a take it

or leave it basis, so long as the contracting party is plainly and clearly notified of the terms and gives "understanding consent," and the terms fall within the reasonable expectations of the party with the weaker bargaining power. *Burch v. Second Judicial Dist. Court of State of Nev. ex rel. County of Washoe,* 118 Nev. 438, 49 P.3d 647, 649 (2002).

Nevada law empowers the Board to contract with physicians for the provision of services at the county hospital. Nev.Rev. Stat. § 450.180(5). The Board adopted the Bylaws, which in turn incorporate the Credentialing Procedures Manual. (Pl.'s Mot. Summ. J. (Doc. # 53), Ex. X at 19.) Under the Credentialing Procedures Manual, the Medical Staff's Medical Executive Committee reviews the application and recommends to the Board whether to approve or deny the application. (Pl.'s Opp'n to Defs.' Mot. Summ. J. (Doc. # 70), Ex. J at 11.) The Board makes a final determination on the credentials application. (*Id.* at 12.) As set forth in the Credentialing Procedures Manual, a physician applying for privileges "agrees to abide by the terms of the Bylaws, Rules and Regulations, polices and procedure manuals of the Medical and Dental Staff and those of the hospital if granted membership and/or clinical privileges, and to abide by the terms thereof in all matters relating to consideration of the application without regard to whether or not membership and/or privileges are granted." (*Id.* at 8.)

█ UMC's Board thus statutorily was required to create the Bylaws, but the Board, acting on UMC's behalf, did not have any statutory duty to grant privileges to any particular physician. Williams had no obligation to apply for privileges at UMC. His application thus was an offer, which UMC's Board accepted by granting him privileges. In applying for privileges, Williams agreed to be bound by the Bylaws if granted privileges. A reasonable

jury thus could find that the parties intended to be contractually bound by the Bylaws. The fact that the Bylaws contain an amendment procedure by which the Medical Staff and the Board jointly may alter the Bylaws does not mean the physician and hospital have not made a bargained-for exchange. That the Bylaws may be amended contrary to the physician's interest is a contractual risk to which the physician agrees, with the understanding that he or she has the option to participate, along with the rest of the staff members, in voting for or against proposed amendments to the Bylaws. (Pl.'s Mot. Summ. J. (Doc. # 53), Ex. X at 41–42.)

Additionally, an unincorporated association's bylaws constitute a contract between the association and its members, and as between the members in their relation to the association. *See, e.g., Hickman v. Kline,* 71 Nev. 55, 279 P.2d 662, 669 (1955) (union's constitution "amounts to a binding agreement between the union and its members with respect to such procedures"); *King v. Grand Chapter of Rhode Island Order of E. Star,* 919 A.2d 991, 998 (R.I.2007) ("The constitutions, bylaws, and rules of private organizations create a legally enforceable agreement in the nature of a contract between the organization and the member."); *Lane v. Urgitus,* 145 P.3d 672, 679–80 (Colo.2006) (allowing real estate agent to pursue arbitration with another real estate agent as co-member of association pursuant to association bylaws); *Rogus v. Lords,* 166 Ariz. 600, 804 P.2d 133, 135 (1991) (stating that unincorporated association's bylaws constitute "a contract between the association and its members and the rights and duties of the members as between themselves and in their relation to the association in all matters affecting its internal government," but holding aspirational ethical rules did not create a contract); *Weber v. Marine*

1144

*Cooks' & Stewards' Ass'n of Pacific Coast,* 93 Cal.App.2d 327, 208 P.2d 1009, 1014 (1949) ("The contractual relation between a voluntary association such as a labor union and its members is based upon the constitution and the by-laws of the association."). A reasonable jury therefore could find that Defendants Medical Staff and Ellerton were in a contractual relationship with Williams.

■ Moreover, a reasonable jury could find that Williams was an intended third party beneficiary of the contract for privileges between Ellerton and the hospital. To be a third party beneficiary, a promissory intent to benefit the third party must be clearly present, and the third party beneficiary's reliance thereon must be foreseeable. *Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 566 P.2d 819, 824–25 (1977). Although not named specifically, a reasonable jury could find Williams is within the class of individuals, other physicians at UMC, which Ellerton and the hospital intended to benefit by mutually agreeing to be bound by the Bylaws. No physician can know, at the time he obtains privileges at a hospital, whether he will be a staff member enforcing the rules, or a physician subject to a disciplinary action. Consequently, it is in the physicians' mutual benefit to agree to the common understanding that the Bylaws control their relationship both with the hospital, and amongst themselves. The hospital and Medical Staff also benefit by reciprocal obligations amongst the members of the Medical Staff to provide for the orderly management of credentialing and privileges determinations. A reasonable jury thus could conclude that when Ellerton and UMC agreed to be bound by the Bylaws, it was not only for the contracting parties' benefit, but also was intended to benefit every other physician with privileges at UMC.

■ Genuine issues of material fact remain as to whether the parties entered into a contract which would support a claim for breach of the covenant of good faith and fair dealing. The Court therefore will deny Defendants' motion for summary judgment as to this claim.[1]

### G. Negligence (Count 10)

Defendants move for summary judgment on this claim, arguing that because the Amended Complaint alleges only a duty to follow the Bylaws, Williams is asserting a contract claim, not a negligence claim. Defendants also argue no independent duty exists to support a negligence claim. Williams responds that a duty arises from the Bylaws themselves, which are government-promulgated rules akin to regulations that are intended to restrict the Board's authority in revoking a physician's privileges without following certain procedures.

■ To establish a negligence claim under Nevada law, a plaintiff must show "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Sanchez ex rel. Sanchez v. Wal–Mart Stores, Inc.,* 221 P.3d 1276, 1280 (Nev.2009). Because negligence is a tort, the breach must be a violation of a duty imposed by law independent of a breach of a contractual duty. *Bernard v. Rockhill Dev. Co.,* 103 Nev.

[1]. Defendants also argue that "[o]ne cannot assert a breach of the covenant of good faith and fair dealing without asserting a breach of contract claim." (Defs.' Mot. Summ. J. at 19.) However, under Nevada law, a claim for breach of the covenant of good faith and fair dealing may exist even where the defendant "literally complied" with the contract's terms. *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.,* 107 Nev. 226, 808 P.2d 919, 922–23 (1991). Consequently, a plaintiff need not assert a breach of contract claim to assert a breach of the covenant of good faith and fair dealing.

132, 734 P.2d 1238, 1240 (1987). However, that does not mean that parties to a contract cannot commit torts against each other. *Id.* The question is whether "the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties." *Id.* (quotation omitted).

■ Williams contends Defendants negligently failed to follow the Bylaws under both contract and negligence theories. Even if Defendants are correct that Williams cannot pursue a negligence claim if the duty not to breach the Bylaws arises from contract, Defendants deny that the Bylaws constitute a contract between Defendants and Williams. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Williams may pursue his contract and negligence claims in the alternative.

Defendants alternatively argue that they owe no duty to Williams. Whether a duty exists is a question of law for the Court. *Ashwood v. Clark County*, 113 Nev. 80, 930 P.2d 740, 742 (1997). Nevada has not specifically addressed whether a public hospital's bylaws, enacted by the county commissioners acting as the hospital's board, impose a duty beyond a contractual obligation to abide by the bylaws. However, at least one such claim has gone to verdict on both contract and negligence theories in Nevada. *See Chowdhry*, 851 P.2d at 461, 464–65 (physician alleged contract and negligence claims regarding hospital's discipline and alleged failure to follow procedures, but jury found physician was comparably more negligent and found no damages related to the breach of the bylaws).

■ In Nevada, a defendant's deviation from an administrative regulation is evidence of negligence. *Price v. Sinnott*, 85 Nev. 600, 460 P.2d 837, 840 (1969) (violation of a rule promulgated by the Nevada Liquefied Petroleum Gas Board held to be proof of negligence). The Nevada Supreme Court also has held a building code adopted by local ordinance may impose a duty sufficient to support a negligence claim. *Vega v. E. Courtyard Assocs.*, 117 Nev. 436, 24 P.3d 219, 222 (2001). For a duty to exist, harm must be foreseeable. *Ashwood*, 930 P.2d at 743.

■ The Court concludes that, like an administrative order or a building code, the Bylaws are the sort of rules or regulations adopted by a governmental body pursuant to statutory authority from which it is foreseeable harm might flow if the rules are violated, and thus are duties imposed by law sufficient to support a negligence claim. The Bylaws were enacted pursuant to statutory command and were intended to guide the Board and to govern the admission of physicians to the staff. Nev. Rev.Stat. § 450.160. Consequently, it is foreseeable that failure to abide by the Bylaws may result in harm to a physician's livelihood related to his privileges at UMC. The Court therefore will deny Defendants' motion for summary judgment as to this count.

## H. Defamation Claims (Counts 11–14)

Defendants move for summary judgment on Williams' claims for defamation, defamation per se, libel, and slander. Defendants argue they cannot be liable on these claims because their statements were true and privileged. Williams responds that the NPDB report is not accurate because it states that at the time of the WP incident, Williams was under investigation for at least two additional airway management incidents. However, despite repeated requests for clarification as to what these two events are, Defendants have identified only one other event, the ambu bag incident. Williams also contends these statements are not privileged

because Defendants had no duty to report a non-existent incident and once Williams put Defendants on notice about the report's inaccuracy, Defendants refused to correct it.[2]

Under Nevada law, to establish a defamation cause of action, the plaintiff must show: "(1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Wynn v. Smith*, 117 Nev. 6, 16 P.3d 424, 427 (2001). If the defamatory statement concerns a person's "lack of fitness for trade, business, or profession, or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed." *Clark County Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009) (quotation omitted).

### 1. Truth

As to the first element, a statement is not defamatory if it is absolutely or substantially true. *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82, 88 (2002). A statement is substantially true if it contains minor inaccuracies that do not amount to falsity "unless the inaccuracies would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 88 n. 17 (quotation omitted). Whether a statement is true or false is an issue of fact for the jury. *Fink v. Oshins*, 118 Nev. 428, 49 P.3d 640, 646 (2002).

The NPDB report states that "at the time" of the WP incident, Williams was "being reviewed because of concerns about his airway management skills in other recent cases." Williams repeatedly request-

ed clarification on what other cases raised concerns about his airway management skills beyond the ambu bag incident. Defendants' counsel stated she would investigate the basis for this part of the NPDB report. To this date, Defendants have not provided an explanation for the reference to other cases of airway mismanagement, nor have they amended the NPDB report.

A reasonable jury could conclude that the NPDB report was false. The statement that at the time of the WP incident, Williams was under investigation for other recent cases suggests at least two cases of airway mismanagement prior to the WP incident. Defendants, however, have never identified another incident for which Williams was under investigation at the time beyond the one ambu bag incident. A reasonable jury could find the suggestion of at least two, and possibly an indeterminate number of other incidents, is therefore false and defamatory to the extent it implies Williams had multiple incidents of airway mismanagement leading up to the WP incident.

### 2. Privilege

Nevada recognizes a common interest privilege which protects publication of a defamatory statement if the defendant made the statement "in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty." *Lubin v. Kunin*, 117 Nev. 107, 17 P.3d 422, 428 (2001) (quotation omitted). Whether the common interest privilege applies is a question of law for the court. *Id.*

**2.** Williams does not identify any oral statements supporting his slander claim in count fourteen, and the Court therefore will grant Defendants' motion for summary judgment

on this claim. *See Bongiovi v. Sullivan*, 122 Nev. 556, 138 P.3d 433, 448 (2006) (slander involves an oral defamatory statement).

■ If the court determines that the privilege applies, the plaintiff then bears the burden of proving the defendant "abused the privilege by publishing the communication with malice in fact." *Circus Circus Hotels, Inc. v. Witherspoon,* 99 Nev. 56, 657 P.2d 101, 105 (1983). Actual malice means the defendant knew the statement was false, or exhibited a reckless disregard for the statement's truth. *Nev. Independent Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337, 344 (1983). Reckless disregard for the truth means a high degree of awareness of the statement's probable falsity. *Id.* A plaintiff meets this burden by presenting "sufficient evidence to conclude that the defendant in fact entertained serious doubts as to the truth of the publication." *Id.* (quotation, emphasis, and alteration omitted). The inquiry thus concerns "the defendant's belief regarding truthfulness of the published material rather than on the defendant's attitude toward the plaintiff." *Id.*

■ The Court concludes, as a matter of law, that the common interest privilege applies to Defendants' report to the NPDB. Pursuant to the Health Care Quality Improvement Act, health care entities are required to submit reports of an adverse action against a physician's privileges within fifteen days from the adverse action. 42 U.S.C. § 11133; 45 C.F.R. § 60.5(c), § 60.9. Health care entities include hospitals and professional societies or committees thereof that engage in professional review activity through a formal peer review process for the purpose of furthering quality health care. 42 U.S.C. § 11151(4); 45 C.F.R. § 60.3. The statute itself grants immunity for any report made without knowledge of the falsity of the information contained within the report. 42 U.S.C. § 11137(c). Defendants thus operated under a duty to report the suspension of Williams' privileges at UMC.

Even if Defendants were not under a statutory duty to report a specific incident, they had an interest in doing so and reported the information to persons with a corresponding interest. The HCQIA was enacted in response to Congress's finding of a national need to restrict the ability of incompetent physicians from moving from state to state and encourages physicians to engage in peer review processes, and disclose to other health care entities in other states any adverse actions against physicians. 42 U.S.C. § 11101. Thus, health care entities share a common interest in engaging in peer review processes and sharing information on physicians throughout the nation, independent of any statutory duty to do so. The Court therefore holds the common interest privilege applies as a matter of law.

Because the common interest privilege applies, Williams bears the burden of showing actual malice. Williams has presented evidence raising a genuine issue of material fact that Defendants acted with actual malice. Williams brought to Defendants' attention on two separate occasions the fact that the NPDB report alluded to numerous incidents of airway management, and Williams twice requested Defendants amend the report. Defendants' counsel twice indicated she would investigate the basis for this statement.[3] However, Defendants never have explained the basis for this statement nor sought to correct it. A reasonable jury could find that having the matter brought to Defendants' attention on several occasions, and Defendants' counsel's statement that the basis for the statement would be investigated, Defendants' failure to justify or correct the report indicates a high degree of awareness of the statement's probable falsity, and Defendants therefore acted with a

3. Defendant Ellerton was copied on this correspondence. (Pl.'s MSJ, Exs. J, N.)

reckless disregard for the truth of the NPDB report.

Defendants concede Ellerton made the report, and that he did so on behalf of Defendant Medical Staff and Defendant UMC. (Defs.' Mot. Summ. J. (Doc. # 66) at 22.) Williams presents no evidence Ellerton was acting on the Board's behalf, or that the Board was a party to the correspondence between Williams' and Defendants' counsel. Williams therefore has failed to present evidence raising a genuine issue of material fact that the Board defamed him by making and refusing to correct the NPDB report. The Court therefore will grant Defendants motion for summary judgment on Williams' defamation, defamation per se, and libel claims as to Defendant Board. The Court will deny the motion with respect to Defendants Ellerton, Medical Staff, and UMC.

## II. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment as to All Claims (Doc. # 66) is hereby GRANTED in part and DENIED in part. The motion is granted as to count one with respect to Defendants UMC and the Board of Trustees; counts eleven, twelve, and thirteen as to Defendant Board; and counts two, three, four, five, six, seven, eight, and fourteen as to all Defendants. The motion is denied in all other respects.